### SI HANDLING SYSTEMS, INC.

v.

**Michael E. HEISLEY, Heico Inc., Philip L. Bitely, Richard O. Dentner, Eagle Sheet Metal Mfg. Co., Inc., Thomas H. Hughes, Sy-Con Technology Inc., Russell H. Scheel, Stanley K. Gutekunst, Barry L. Ziegenfus, Frank V. Possinger.**

Civ. A. No. 83–1336.

United States District Court
E.D. Pennsylvania.

March 1, 1984.

E. Jerome Brose, Charles Elliott, Thomas Elliott, Easton, Pa., for plaintiff.

Anthony Creato, Harold H. Cramer, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON APPLICATION FOR PRELIMINARY INJUNCTION ENJOINING DISCLOSURE AND USE OF TRADE SECRETS BY FORMER EMPLOYEES OF PLAINTIFF CORPORATION

TROUTMAN, Senior District Judge.

This matter comes before the Court on plaintiff's motion for preliminary injunction wherein it seeks to enjoin disclosure and use of trade secrets. The complaint was filed on March 21, 1983 and motion was filed October 18, 1983. Testimony commenced November 7, 1983 and, with some interruptions, consumed 25 days through closing arguments on February 2, 1984.

At the hearing on the motion the following facts were established. Plaintiff, SI Handling Systems, Inc. ("SI"), is a Pennsylvania corporation located in Easton, Pennsylvania. It was founded by its present chairman and chief executive officer, L. Jack Bradt, in 1958 to purchase certain assets of Safety Industries, Inc. At its inception SI employed four persons. Presently, it is a publicly-held corporation employing some 300 people with plant and offices of approximately 170,000 square feet. From its beginning SI's strategy has been to define unmet needs in the materials handling field, acquire or develop products which fill these needs and then, after the investment required to make them marketable, offer the products in the marketplace as unique solutions to customers' handling problems. Part of that process necessarily

involved the large investment in time and money to obtain the necessary advances in technology required to give its products a competitive advantage. This competitive advantage is based on the proprietary nature and uniqueness of each of SI's products. SI's product line presently consists of four products: Switch-Cart, OrderMatic, ItemMatic and CARTRAC, the product which spawns this litigation.

There are three corporate and eight individual defendants. The eight individuals are former employees of SI and presently work for one or the other of the corporate defendants.

Defendant HEICO, Inc. ("HEICO"), formed in May, 1979 is a corporation located in Mendota, Illinois, and is the parent company of Sycon Technology, Inc. and Eagle Sheet Metal Manufacturing Co., Inc. It is, therefore, either the direct or ultimate employer of all the individual defendants. The company's products include a materials handling system being marketed under the name of ROBOTRAC, the division for which was formed in early 1983 and which division was manned by Scheel, Gutekunst, Ziegenfus and George Bartha, all employees.

Defendant Eagle Sheet Metal Manufacturing Co., Inc. ("Eagle") is an Illinois-based corporation engaged in the manufacture of sheet metal products, including computer furniture. It was acquired by HEICO in 1982.

Defendant Michael E. Heisley ("Heisley") is the Chairman of HEICO. Heisley went to work for SI in 1973 as Vice President, Automated Warehousing Systems. One year later he became President and Chief Operating Officer. He resigned from SI in 1978.

Defendant Richard O. Dentner ("Dentner") joined SI in 1970. He was verbally notified on April 19, 1982 of his termination of employment on May 9, 1982. After May 9, 1982, however, he was retained by SI for certain consulting work during the succeeding months. At the time of his departure from SI he was Vice President of Operations responsible for manufacturing, engineering and installation of the company's products. During his tenure there he was instrumental in developing and perfecting SI's manufacturing and installation techniques for CARTRAC. Dentner is now President of Eagle.

Defendant Philip L. Bitely ("Bitely") was employed by SI from October, 1972 to October, 1978. At the time of his resignation he was the chief financial officer of the company serving in the capacity of Vice President-Comptroller. He is now President of HEICO, Inc.

Defendant Russell Scheel ("Scheel") was employed by SI in 1974. He submitted his resignation to SI on February 22, 1983. At that time he held the position of Director, Systems Engineering responsible for interfacing with customers in the automotive industry. He is presently employed by HEICO in its ROBOTRAC division with marketing responsibilities for the automotive industry.

Defendant Stanley K. Gutekunst ("Gutekunst") began his employment with SI in 1976. He submitted his resignation to SI on February 22, 1983. At the time of his departure from the company he was Manager of Mechanical Engineering, having worked most of his time with the company in the areas of engineering and installation. Gutekunst is presently employed by HEICO, Inc. in its ROBOTRAC division.

Defendant Barry L. Ziegenfus ("Ziegenfus") commenced employment at SI on June 17, 1968 as a draftsman. He eventually became Manager, CARTRAC Design Engineering in which capacity he was responsible for the supervision of the people working in the CARTRAC department and for systems engineering. During his employ at SI he was in charge of the exchange of technology with SI's Japanese licensee, ISHIKAWAJIMA–HARIMA HEAVY INDUSTRIES CO., LTD. ("IHI") Obtaining this technology was important for the introduction of CARTRAC to the American automotive industry, IHI having already made some successful automotive installations in Japan. Ziegenfus resigned from SI on February 22, 1983 and on

March 6, 1983 commenced employment with HEICO in its ROBOTRAC division.

Defendant Frank V. Possinger ("Possinger") was hired by SI in 1974. His employment was terminated in June, 1982 at which time he held the position of Manager, Cost Accounting and Cost Estimating, a function which involved the indexing of material cost for past and future SI projects including CARTRAC. He is presently employed by HEICO.

Defendant Thomas H. Hughes ("Hughes") commenced employment with SI in February, 1976 as the Manager of Field Sales. He advanced to the position of Vice President of Marketing. At the time of his resignation from SI on July 3, 1981 he was the Vice President, Process Control Systems. Presently he is employed by defendant Sycon Technology, Inc. ("Sycon"), a wholly-owned subsidiary of HEICO and a company which supplies control systems to HEICO.

SI competes in the materials handling industry. This industry comprises methods, mechanisms and systems to transport materials within a distribution or manufacturing environment. Fork lift trucks and conveyors are examples of mechanisms falling within the field of materials handling. One of SI's products is the CARTRAC system. This system involves the movement of a carrier (upon which the product to be moved is placed) by propulsion provided by the thrust imparted to a drive wheel by a spinning tube located between the tracks upon which the car rides. The drive wheel is adjustable such that by changing the angle acceleration and deceleration of the carrier can be controlled. Thereby, materials can be automatically moved from one work station to the next throughout a factory. The importance of carefully controlling this movement is seen in the interfacing of the system with robots, where precision starting and stopping is a must. Although the general principle

governing propulsion of the system is not a new concept it is clear that the present state of the art of SI's CARTRAC represents unique advancements over competing, although not as precise, systems and would seem to be uniquely suited to the tasks required for a fully automated carrier system. This uniqueness is evidenced somewhat by the scarcity of competing companies in this form of materials handling.[1]

CARTRAC was originally conceived and manufactured by a company in Sweden. In the late 1960's SI acquired the worldwide rights to CARTRAC from the Swedish company for the purchase price of 1.2 million dollars. Thereafter it began an intensive research and development effort to advance the product to a high level of sophistication, suitable for use in various applications. In doing so it incurred substantial expense in developing workable system operations for varied customers and uses. One example of this was a million dollar overrun incurred on a system to transport munitions at the Lone Star Arsenal. Together with its own development efforts SI sought out licensees who would design and manufacture CARTRAC in other parts of the world, obtaining, in the process, grantbacks of the licensee's developments. Its first licensee was IHI in Japan. The license agreement provided, *inter alia,* for the joint exchange of technology and technical assistance. In SI the person in charge of this exchange was Ziegenfus.

In the mid-1970s, when all individual defendants were SI employees, SI became aware of the introduction and use in the automotive industry of CARTRAC systems in Japan. IHI had successfully advanced the performance of the product to a point where it could be interfaced with robots with the precision required for automated manufacturing. SI undertook to obtain this advanced technology from its licensee

---

1. In addition to SI's licensees there would appear to be only two other companies marketing similar systems. These are Japanese companies identified as Murada and Daifuku. Testimony concerning the Murada system described it as one utilizing a different type of propulsion to move the carrier. No testimony was offered concerning the Daifuku system. Further, there was no testimony that these companies are operating or selling their systems in the United States.

and with it, to penetrate the U.S. automotive industry. Instrumental in these efforts were the individual defendants. After moderate success in selling systems to Chrysler[2], SI mounted a campaign to convince General Motors that CARTRAC could provide the automated system necessary for it to retool and meet the Japanese automotive challenge. Key in this effort were Scheel and Dentner. Scheel became the main contact with GM in the lengthy effort to pierce the corporate labyrinth of General Motors, find the decision makers, and convince GM that SI could provide a dependable system. Initially there was substantial resistance but in spite of this success was achieved in several installations and General Motors came to be convinced that CARTRAC was ideally suited to its needs.

In January 1981 GM negotiated a contract with SI for the supply of $17,000,000 worth of CARTRAC. To perform this contract SI invested over 20,000 engineering hours to further develop the CARTRAC system to accommodate the particular needs of GM. Specifically, it was necessary to advance CARTRAC to a point where it could convey very heavy loads at high speeds yet precisely locate them at a work station within five-thousandths of an inch. Gutekunst, Ziegenfus, Scheel and Dentner were the key people at SI who were able to bring about this accomplishment. The required systems were successfully installed at General Motors.

Additional contracts have since been forthcoming from General Motors and the prospects appear good that GM will purchase CARTRAC in the future. In supplying product to General Motors SI took precautions not to give GM any more technical detail than is necessary for successful operation and maintenance of the systems. Specifically, it refused each request by GM for detailed drawings of the various components of the CARTRAC system. Only assembly or top level drawings without detailed dimensions and tolerances were supplied. Further, SI withheld from GM details as to its costing and pricing of the systems.

In early 1982 Heisley and Bitely were employees of HEICO and Hughes was employed by Sycon. The remaining individual defendants were still employed at SI. On April 17, 1982 Dentner was notified of his upcoming termination by SI on May 9, 1982. Unknown to SI, a plan was then being implemented to market a competing car-on-track system and capture the General Motors market developed by SI.

Introduced into evidence as P–17 was a 14-page document described as a prospectus—a document prepared by defendants apparently to interest venture capital—later verified by two business proposals, one sent to Midwest Conveyor Co. and the other to ACCO. Portions of the document were dated May 4, 1982, a date when Dentner, Scheel, Gutekunst, Ziegenfus and Possinger were still employed by SI. Page two of the prospectus contains a history of the acquisition and development of CARTRAC by SI and the success attained in sale of the product to GM. It then states that Dentner left SI to form ROBOTRAC because CARTRAC was being overpriced, saying:

> The purpose of the ROBOTRAC organization is to provide a group of uniquely qualified former SI Handling Systems' management personnel with the capital and manufacturing facilities to supply a system competitive to CARTRAC. The following capabilities are unique to ROBOTRAC: (1) Almost all the senior management personnel from SI Handling Systems who developed CARTRAC are part of the ROBOTRAC team. This group includes: (a) Dick Dentner[3], VP of Operations responsible for manufacturing, engineering, computer controls, installation and service; (b) Stan Gutekunst[4], Director of Engineering for all

---

**2.** At approximately this time, Heisley and Bitely left the employ of SI.

**3.** Dentner—Although noticed on April 19, 1982 Dentner continued to act as Vice President of Operations until May 9, 1982.

**4.** Gutekunst remained in the employ of SI until February 25, 1983, having submitted his resignation on February 22, 1983.

product lines including CARTRAC; (c) Russ Scheel[5], Director of Systems Engineering responsible for providing systems engineering responsible for system solutions utilizing SI products (especially CARTRAC) for customer problems; (d) Barry Conklin[6], Manager of Control Systems. . . . ; (e) Additional people available as the organization grows are: (1) Manager of Field Engineering; (2) Plant Managers; (3) CARTRAC mechanical engineers[7] [2]; (4) other direct employees[8] who work for these managers.

Therefore, the ROBOTRAC organization has all the personnel with the management and product experience to supply successful systems. They need only the capital to duplicate the successful performance at SI.

The document goes on to describe the ROBOTRAC product in a manner identical to the CARTRAC product in terms of its performance capabilities.

On page eight of the prospectus is contained the following:

In 1978, Mike Heisley, President of SI Handling Systems, had an in-depth study performed on the patent position of the CARTRAC system. This study was performed by the SI engineering organization and Ed Gonda, the SI patent attorney. The results of that study clearly indicated that the Jacoby Patent No. 3,818,837 was the only significant patent. This patent covers car-to-car accumulation which is an inexpensive but effective way to accumulate on a CARTRAC system.

In April, 1982 Stan Dalton, patent attorney with Wagner, McCord, Wood and Dalton, reviewed the patent position of CARTRAC and confirmed that the previous patent position had not been improved.

The ROBOTRAC team reviewed several alternatives to the Jacoby patent and Mr. Dalton confirmed that they would not infringe. In addition, he indicated in April 19, 1982 letter that possibly the Jacoby patent was invalid.

The ROBOTRAC team, because of their familiarity with CARTRAC, can—with minimum effort—by-pass the SI patent position.

The document goes on to state under the title of "Operational Plan":

Initially, ROBOTRAC, inc. will be responsible for selling, engineering, project management, installation and service. It is anticipated that the manufacturing of the product will be subcontracted to another company. The ROBOTRAC organization has in-depth knowledge of the times required by SI to fabricate the product. They will expect the subcontractor to meet these times at a predescribed rate per hour . . . . .

On June 26, 1982 Dentner authored a letter to Midwest Conveyor, a competitor of SI in the materials handling industry. The subject matter of the letter was a "proposed plan of action for Midwest Conveyor's ROBOTRAC product." In this letter Dentner detailed the people who would staff an Easton Office responsible for concepting and designing ROBOTRAC components. These individuals included Scheel and Gutekunst, previously identified as part of the ROBOTRAC team. Of particular note is Dentner's statement in regard to the basic designs of the most recent GM body shop system components that: "I feel it is important to get the basic designs completed while they are still fresh in our mind."

Consequently, we find that as early as May 4, 1982 plans were being formed to

---

**5.** Scheel remained in the employ of SI until February 25, 1983, having submitted his resignation on February 22, 1983.

**6.** Barry Conklin remains an employee at SI.

**7.** Ziegenfus, the chief engineer in charge of CARTRAC resigned from SI on the same day as Scheel and Gutekunst.

**8.** George Bartha, a draftsman/detailer at SI resigned shortly after Ziegenfus, Scheel and Gutekunst resigned and now works for HEICO's ROBOTRAC division.

market a car-on-track system to compete with SI. The nucleus of the plan was the "ROBOTRAC Team" composed of key SI personnel. As noted, two members of the announced "ROBOTRAC Team" were then employees of SI and remained as such until February, 1983.

On July 20, 1982 Heisley authored a letter to ACCO Industries, another competitor of SI's in the materials handling industry. The subject matter of the letter is set forth in the first paragraph: "It was indeed a pleasure to meet with you and your group in Detroit to discuss the CARTRAC, or as we choose to call it, the ROBOTRAC system." The letter goes on to detail three proposals whereby ACCO could have access to the ROBOTRAC product line at substantially less cost than starting with ACCO's own development group. These proposals were: (1) to start a joint venture operation; (2) for HEICO to set up an engineering group in Easton and hire the personnel from SI necessary to provide ACCO with all the engineering drawings to build ROBOTRAC; and (3) for ACCO to hire Dentner and two or three of his associates directly.

In February, 1983 defendants Heisley and Dentner took the last steps necessary to form the complete ROBOTRAC Team. They sought out Scheel and Gutekunst and convinced them to work for HEICO. In turn, Scheel and Gutekunst convinced Ziegenfus, CARTRAC's key engineer, to work for the new venture. All three tendered their resignations on February 22, 1983, two left on February 25 and the third a week later. Within weeks all were working for HEICO in the ROBOTRAC division at an office site in Easton. Shortly thereafter Ziegenfus convinced George Bartha, an SI CARTRAC draftsman, to work for HEICO as well.

On February 25, 1983 defendant Heisley wrote to Robert A. Burkhart, Director of Purchasing for the Fisher Body Division, General Motors. This letter announced formation of a new HEICO, Inc. division—ROBOTRAC. As stated in the letter, ROBOTRAC's purpose is to "market, design, engineer, manufacture, install and service a high quality, low cost product similar to

SI's CARTRAC." The ROBOTRAC staff was listed as follows:

(a) M.E. Heisley—
   former President of SI Handling Systems, Inc. from 1973–1978
(b) Philip Bitely—
   former V.P. of Finance, SI Handling Systems, Inc. from 1971–1979
(c) R. O Dentner—
   former V.P. of Operations,
   SI Handling Systems, Inc.
   responsible for manufacturing, engineering and installation of all SI products including CARTRAC from 1970–1982
(d) Tom Hughes—
   former V.P. of Control Systems,
   SI Handling Systems, Inc.
   Tom and five other Control Specialists are part of Sycon Technology, a subsidiary of HEICO, Inc. from 1975–1982
(e) Stan Gutekunst—
   former Director of Engineering and Installation,
   SI Handling Systems, Inc.
   responsible for SI products including CARTRAC from 1976–1983
(f) Russ Scheel—
   former Director of CARTRAC Systems Engineering
   SI Handling Systems, Inc. from 1968–1983
(h) Frank Possinger—
   former Manager, Cost Accounting,
   SI Handling Systems, Inc. from 1973–1982

The letter concluded with a statement that HEICO now possessed the experienced personnel necessary to provide an alternative to SI.

On April 11, 1983, HEICO, through ROBOTRAC, submitted to General Motors an "unsolicited bid" for three spinning tube systems. Although unsuccessful in obtaining the bid, it is significant to note that the bid was even considered by GM. Part of the development effort expended by SI in securing General Motors as a customer was the selling of itself as a company that could accomplish the systems engineering

necessary to fully automate its manufacturing operations. HEICO, on the other hand, went through no such process. Rather, it attained instant stature with GM by the means of hiring away the key SI people who sold General Motors on the system in the first place and then performed as required to install the systems.

Since the formation of the new division HEICO has been successful in securing one contract with General Motors for an installation at its Livonia plant. It has also bid on several other systems. Of note is its bid on what was termed the Buick City job. The request for quotation on this job was answered by SI and HEICO and the contract awarded to SI. This entire process took place during the time of the hearing. Two matters concerning this bid are important.

First, General Motors' request was conditioned upon responder's undertaking to deliver detailed drawings of all products supplied as well as title to all new develop-ments created in the performance of the contract. SI took exception to these conditions; HEICO did not.

Second, General Motors referred to CARTRAC components in the request by specific CARTRAC[9] terminology and by reference to MH drawing numbers. These MH numbers are General Motors' internal description for SI CARTRAC components.

SI has taken the usual and reasonable precautions at its Easton facility to preserve and protect the confidential nature of its development of the CARTRAC product. Entry into the building is limited and visitors are restricted. All visitors must have passes[10] and be escorted throughout the operation when they are inside the building. Alarm systems are utilized when the business is closed. Certain documents of a highly proprietary nature are marked accordingly. Files containing sensitive documents are locked. Drawings are pre-stamped with a proprietary legend.[11] In addition, the majority of employees[12] at SI are required to sign an Employee Agreement[13] which purports to limit disclosure

9. CARTRAC is a registered trade name of SI's.

10. The Visitor's Pass states: In consideration of permission to enter the premises of SI Handling Systems, Inc. the undersigned agrees not to disclose to others nor to use any information disclosed to him by SI Handling Systems, Inc. or derived by him during this visit except for any part of such information that is available publicly or from other lawful sources. Read carefully before signing.

11. The designs, concepts and features depicted or described herein are the exclusive property of SI Handling Systems, Inc. and are submitted in confidence. Permission to use or reproduce in any way this proprietary information is expressly withheld.

12. The court notes that although not all SI employees have signed this agreement, it is uncontested that all the individual defendants did sign such an agreement.

13. The pertinent parts of the Agreement are as follows: "For good and valuable consideration, and in consideration of my employment by SI Handling Systems, Inc., or by any one of its affiliated or parent companies or by any company which may hereafter become its affiliated or parent company and it or their successors in interest (hereinafter described as SI), I hereby agree as follows:

1. I will devote my best efforts to the interest of SI, and will not, during my period of employment by SI, engage in other employment or other business activity hostile to, or competitive with SI, or which so occupies my attention as to interfere with the proper performance of my duties.

2. All information received by me relating to the business of SI shall be deemed strictly its exclusive property, and shall remain SI's valuable scientific trade and engineering secrets, both during and after my employment, without limitation as to time; and I shall not at any time reveal any such information to others, except in cases where this is necessary for the performance of my duties for SI, and then only with the consent of SI; nor shall I make use of any such information in any way hostile to that of SI.

3. I agree to give SI the full benefit, enjoyment, ownership, and title to all improvements and/inventions which I may conceive or first actually reduce to practice during my term of employment, relating to the kinds or types of apparatus, appliances, devices and methods now being developed, perfected or exploited by SI, during my term of employment; and I agree, further, to execute upon request all instruments necessary or incident to the filing of patent applications on such improvements and inventions and to the securing of patents thereon in the United States of America, and all countries foreign thereto; and I further agree to execute, upon request, all instruments and assignments which SI may deem necessary to secure to it the entire right, title and interest in and to all such improvements and inventions made by me as aforesaid, and in and to all such patents, patent

by employees of confidential information. Licensees of SI are duly proscribed from disclosure of the licensed designs and processes received via their respective license agreements.

All Sales proposals [14] for, and maintenance manuals [15] provided with, CARTRAC systems contain restrictive use language. SI's purchase orders to suppliers also contain a restrictive provision.[16]

Initially, the court notes that a preliminary injunction is an extraordinary remedy. In order to obtain a preliminary injunction the plaintiff must demonstrate: (1) that there is a substantial probability that it will succeed on the merits of its case; (2) that it will suffer immediate and irreparable harm if the preliminary injunctive relief is not granted; (3) that the harm to the plaintiff from the denial of an injunction will be greater than the harm to defendants if an injunction issues; and (4) that injunctive relief would serve the public interest. For the reasons discussed herein, the court is satisfied plaintiff has met its burden on points one, two and three. Concerning the fourth requirement the court finds that the preservation of commercial morality far outweighs any negative impact on free competition which might result from any order emanating from this litigation.[17]

SI contends that the defendants have misappropriated its trade secrets and are now using those secrets in competition with it. Our first inquiry, therefore, is what is the law in Pennsylvania with regard to trade secrets.

The Pennsylvania Supreme Court in *Van Products Co. v. General Welding and Fabricating Co.*, 419 Pa. 248, 213 A.2d 769, laid down the guiding principles of law in the area of trade secrets.

The concept of a trade secret is at best a nebulous one and has been variously defined by case and text authority. Restatement, Torts § 757, comment b, states that a 'trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it' ... 'To be entitled to equitable relief the burden was on [the employer] to show (1) that there was a trade secret, or as in the case at bar, a secret process of manufacture; (2) that it was of value to the employer and important in the conduct of his business; (3) that by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret; and (4) that the secret was com-

applications, and the inventions covered thereby.
  4. It is understood that SI will pay me the sum of Ten Dollars ($10.00) for each application for patent filed in the United States Patent Office and assigned by me to it ....

14. The designs, concepts and features depicted or described herein are the exclusive property of SI Handling Systems, Inc. and are submitted in confidence. Permission to use or reproduce in any way this propriety information is expressly withheld by SI Handling Systems, Inc.

15. The drawings and illustrations contained in .this manual are intended to assist supervisory and maintenance personnel. Their technical content and accuracy were confirmed at the time for publication. SI Handling Systems, Inc. cannot assume responsibility or liability if these drawings and illustrations are altered by user personnel. Reproduction of the content of this manual, in whole or in part, without written permission of SI Handling Systems, Inc. is prohibited. The SI design concepts and features depicted or described are the *exclusive* property

of SI Handling Systems, Inc. and are submitted in confidence and are SI Handling Systems, Inc. proprietary information.

16. Goods made in accordance with buyer's specifications and drawings shall not be furnished or quoted to any other person or concern. All specifications, drawings, tools, jigs, dies, fixtures, materials and other items furnished by buyer or the cost of which is charged against this order shall be confidential and shall be and remain the property of the buyer and subject to removal upon buyer's instructions. The seller shall mark all such items with the name 'SI' and the corresponding drawing number, and shall be responsible for the safekeeping of such items when in its custody.

17. Defendants asserted as a defense laches on the part of plaintiff in not moving for a preliminary injunction until approximately seven months after the filing of its complaint. Given the magnitude of discovery and the complexity of the facts the court is satisfied there was no undue or unjustified delay on the plaintiff's part.

municated to [the employee] while he was employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer.' Citing *Macbeth-Evans Glass Co. v. Schnelbach*, 239 Pa. [76] at 87, 86 A [688] at 691, *Id.* at 258, 259 [213 A.2d 769].

The starting point for the court in *Van Products Co.* was not whether a confidential relationship existed between the employer and the employee. Its point of inquiry was whether there was a trade secret to be misappropriated. The court in examining the facts before it found the subject product did not contain trade secrets in part because of widespread publication and advertising. Further, the product itself was publicly disclosed. With these principles as guides we review the facts before us.

The first question is what is the product which SI markets under the name CARTRAC? We begin with the understanding that CARTRAC involves the use of a spinning tube conveyor system to transport materials from and to various work stations within a manufacturing facility. To the extent a system is installed it is disclosed to the public. Each such system, however, is different in terms of exactly what it may accomplish. Accordingly, the product is more than simply the hardware that may be installed at a customer's location. Rather, the product is the engineered solution to a particular customer's need. Such a solution is not limited to the installation of component hardware parts and cannot be divined by inspection of same. Rather, the marriage of mechanics plus what may be termed systems engineering know-how results in the product which is supplied to the customer—a highly sophisticated and unique engineered solution. This is not know-how in terms of one's knowledge of how a certain mechanical device may be used or how to reach a solution to an engineering problem. Rather, it is the

hard-earned know-how to answer a customer's need—the mechanical components being elements only in the supplying of that engineered solution.

The court finds, therefore, the product is not one that has been fully disclosed or dedicated to the public.[18] To the contrary, that which may be observed by the public represents only one part of the CARTRAC product. The inquiry now turns to the issue of what trade secrets, if any, are present in the CARTRAC product.

In *Van Products* the plaintiff advanced know-how as a trade secret. In addressing that issue the Court noted that know-how was a "fuzzily defined area, often embracing general knowledge and skill of an employee". In the instant case plaintiff advances know-how as a trade secret.

Plaintiff asserts that it possesses know-how in terms of systems engineering. SI is in the systems business, a business where the ultimate product is a compilation of experience and specialized engineering employed to identify the problem and then combine components, either its own or of others, to reach the result desired. Its stock in trade can be said to be *solutions* to customers needs; the hardware employed being certainly not incidental but nevertheless subservient to the systems objective.

In this context "know-how" takes on a meaning far beyond simply assembling components. Rather, it is the ability, gained from trial and error, experimentation and the expenditure of many dollars in investment which collectively gave to SI this type of know-how. This know-how is distinguishable from an individual's general knowledge and skill. Gutekunst, Scheel and Ziegenfus are engineers by trade. It was their general knowledge and skill which allowed them to solve engineering problems while working on the CARTRAC product. Their general knowledge and skill are theirs and can pass with them into any employment they may seek. What is

---

**18.** The literature, brochures and articles concerning CARTRAC introduced into evidence by defendants demonstrate the utility of the product only and do not constitute disclosure as found by the court in *Van Products Co.*

not theirs, however, is the know-how in systems engineering they acquired while on the payroll at SI for the purpose of developing it *for* SI. This belongs to SI, is a valuable secret to it and has been unlawfully appropriated by the defendants. It may be that each individual component of the CARTRAC system can be duplicated given unlimited time and money. What cannot be learned from such an exercise, however, is the knowledge of how to make a system work to satisfy a customer's particular problem. The testimony delineates that each system is different. The thread which connects these differences is the systems engineering know-how implicit in the use of varying techniques to harness different component designs to produce varied results for individual customers' end uses.

As discussed above know-how in systems engineering is part of the engineered solution which is the CARTRAC product. SI regards this know-how as its trade secret. This know-how is the cumulative knowledge and experience necessary to design a materials handling system which answers a particular customer's needs in a unique way. As such it goes far beyond the general knowledge and skill which any employee might gain by working at SI. That type of "know-how" is seen in the everyday abilities of the individual defendants such as Gutekunst and Scheel to apply their general engineering knowledge. Such know-how passes with the employee to the benefit of his new employer. SI's system engineering know-how—the knowledge of how to make a system work—on the other hand is grounded in the trial and error, experimentation and expenditures of investment dollars over the period of product development. This know-how belongs to SI, is a valuable secret to it and has been unlawfully been appropriated by defendants. It may be that each individual part of the hardware installed in a CARTRAC system can be duplicated given unlimited time and money. What cannot be learned from such an exercise, however, is the systems engineering know-how necessary to make the next system work. The testimony delineates that each system is different. The

thread which runs through the CARTRAC product is the systems engineering know-how exhibited by use of component designs in varied applications. SI's know-how is its trade secret.

Testimony concerning trade secrets in the methods of manufacturing and installing the CARTRAC hardware was by its very nature highly technical. Detailed discussion of some of the concepts and mechanisms is, therefore, precluded as to do so might very well result in a disclosure of trade secret information.

▆ Various of the matters offered by SI as trade secrets do not rise to such status. For example, the use of lacquer on drive tubes is a matter disclosed when the product is delivered to a customer and a use that is easily ascertainable. Likewise, the existence of vendors or suppliers of components are matters discernable from the installed product albeit, in some instances, the product would have to be taken apart. In other areas, however, trade secrets do exist. The method of examining drive tubes for concentricity is not disclosed by the product, is a method peculiar to SI and is a trade secret. The dimensions, tolerances and method of fit between drive tubes and drive plugs are matters not susceptible to reverse engineering as same would be obliterated in the process. These also represent trade secrets. These latter two categories of secrets were demonstrated as being used by defendants on ROBOT-RAC drawings produced in evidence.

▆ Further, the court finds the following to constitute trade secrets: (1) the existence of alternate suppliers of parts at lower prices; (2) knowledge of long lead times in component supply; (3) the non-standard coefficient of friction used by SI in making calculations for system design; (4) efficiency factors gained from component experience; and (5) use of a nonstandard maximum angular misalignment in conjunction with certain grease pack specifications in bearings. These matters were of value to SI, not disclosed to the public, and afforded it an advantage in manufacturing and installing CARTRAC hardware.

As such, they constitute protectible trade secrets.

Plaintiff urges that its knowledge of the key decision makers within General Motors is a trade secret. Pennsylvania law has long afforded protection to an employer's confidential customer information, *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838 (1957). This is true even though the information departs the employer in the mind of the employee who, himself, may have compiled it. Nevertheless, such information must still satisfy the requirements for a trade secret, *Van Products Co.*, supra. SI painstakingly developed contacts in General Motors in the arduous task of convincing GM that SI could provide an engineered solution to GM's retooling problems. It was only after peeling through layer and layer of personnel and following many false leads that SI was finally able to reach the real decision-makers as to its product. The development of these contacts was a secret to SI and was of value to it. Primarily through Scheel this secret was wrongfully appropriated by the defendants. Scheel's testimony, introduced by deposition, verifies the secret is being used in that the people he began dealing with at GM for HEICO were the very same people he dealt with for SI.

In the same vein, SI asserts several trade secrets dealing with identification of specific new markets for CARTRAC. The first of these concerns two-way accumulation of a CARTRAC carrier. Such a device had been sold to General Motors at a price of approximately $400,000. Although General Motors liked the product, it deemed it uneconomical at a price exceeding $200,000. Consequently, a priority was set within SI to concept and develop a two-way accumulation system priced within this parameter in order to fill the now identified need within General Motors. In SI this priority fell to Scheel, Gutekunst and Ziegenfus in 1981. Despite the assignment nothing was forthcoming during the period of 19 months preceeding their departure. Nevertheless, on April 11, 1983 HEICO submitted an unsolicited bid to GM to supply the two-way accumulation system at a cost ap-proximating the desired $200,000 mark. It is inconceivable to this Court that the same defendants who were unable within the preceding 19 months of effort to *concept* the product were, within six weeks of their departure, able to not only originate a concept but also to design and cost the same to the point of bid unless, of course, they did so by misappropriating the unmatured development effort paid for by SI. We are convinced that that is exactly what the defendants did and are buttressed in this view by the testimony to the effect that such an accomplishment was impossible in so short a period of time. Further, without the knowledge of this market need gained at SI they would not have even attempted to do so. Such knowledge was peculiar to SI, not shared with competitors and was of distinct competitive advantage to SI. Accordingly, same fits the definition of a trade secret. For these reasons the two-way accumulation concept developed by defendants for ROBOTRAC is deemed to be the property of SI and is presumably a trade secret as well.

Two other potential needs were identified in plaintiff's terms as a "tugger system" and a "buffer system". Once again, these potential markets represent confidential customer information as to the identification of product need in General Motors. For the same reasons as were discussed in regard to the two-way accumulation system, these potential markets are plaintiff's trade secrets.

It is undisputed that there are three patent applications pending for inventions relating to the CARTRAC systems provided to General Motors. These relate to mechanisms not necessary to describe here that were supplied to General Motors in the $17,000,000 purchase and are items included in the Buick City request for quotation. Scheel, Gutekunst and Ziegenfus are named as the inventors in one or more of these devices—inventions made during their employ at SI. The inventions and the patent rights, upon issue, have been assigned to SI and are its property. There can be no dispute that these patent applications and the concepts contained therein are trade secrets.

■ Another of plaintiff's trade secrets was established through a defense exhibit (D–55). During the presentation by defendants' expert witness the exhibit was used to demonstrate the workings of defendants' ROBOTRAC prototype. Depicted thereon is a configuration of various mechanisms being used to avoid infringement of an SI patent known as the Jacoby Patent. Documents prepared by the defendants in 1982 made reference to the fact the ROBOTRAC Team, which included then-SI employees Gutekunst and Scheel, had designed around the Jacoby Patent. Hence this was done at a time when such design work was, by the Employee Agreements signed by each defendant, the property of SI. As stated, the exhibit introduced by defendants depicted ROBOTRAC's method of avoiding the Jacoby patent. The configuration is, therefore, plaintiff's and its trade secret as well.

In reviewing *Van Products Co.* it is clear the court determined that the product being sold by the defendant was truly different from that of the plaintiff, although its utility and purpose were identical. Defendant there employed a desiccant of his own creation, sufficiently novel to entitle him to a U.S. patent thereon. In the instant case, with the exception only of the design change to avoid infringement of the Jacoby Patent, the defendants are offering the SI product to GM simply under a different name. HEICO responded to the Buick City Request for Quotation. To do so it has to offer to supply the SI CARTRAC because that was what the specifications called for. Here, therefore, the "desiccant" is identical in both products and the holding of *Van Products Co.* is inapposite.

■ SI claims as a trade secret its CARTRAC costing/pricing methods to include the specific components thereof such as the field repair factor and its targeted gross profit margin. Defendants maintain this represents standard accounting procedure and, since the actual numbers may vary from job to job and from time to time, knowledge thereof is of no importance. Even if the basic formula used to arrive at a price is no more and no less than standard business practice the actual numbers used are distinct to SI. Defendants Scheel, Dentner and Gutekunst were knowledgeable as to those numbers while employed at SI. Indeed, documents generated for ROBOTRAC by these defendants both during and after their employment at SI clearly demonstrate the use of this knowledge in their plans to sell ROBOTRAC at 20% less that the SI sale price.[19] Such knowledge of a competitor's pricing structure can be no less than devastating to that competitor. This knowledge was highly confidential to SI, not shared outside the company and represents trade secret information unique to SI.

■ Produced during the hearing was an SI book of formulas entitled "CARTRAC Engineering Data, Theoretical and Practical Analysis" which book was written by K. Tokunago, an engineer employed by SI's Japanese licensee, IHI. Plaintiff maintains this book to be a trade secret valuable in the designing of a car-on-track system. The book contains a number of formulas described as standard in the field of engineering and commonly known in the public domain. The book also contains, however, a number of formulas described as derived formulas. Further, the formulas to some degree are based on experimental data and assumptions not in the public domain. Plaintiff's expert in mechanics and mechanical engineering testified that the book: (1) contained matter not within the public domain; (2) represented an advance over information in the public domain; (3) contained information that is an advance over common knowledge and practice in the art of mechanical engineering; (4) employed experimental or experiential non-public domain parameters; and (5) would provide a

---

19. HEICO could obtain the same approximate net profit as SI despite a lower gross profit margin due to the fact it was approaching the market without the same investment structure as SI. It entered the business without the baggage of R & D marketing, etc. expense which account for a higher SI price structure. To sell to General Motors there was no need for marketing, investment or R & D. It knew GM wanted the product which meant all it had to do was to produce the product, not develop and sell it.

competitive advantage to someone seeking to build a car-on-track system over someone with otherwise equal engineering abilities who also sought to build such a system. This compilation of formulas was intended by Mr. Tokunaga for usage in the daily designing routines of CARTRAC. Testimony by SI's employee, Robert Hale, was to the effect this was the manner in which the book was in fact used. The usage, however, was restricted in that only a limited number of copies of the book were distributed within the company. Copies of the book, however, were distributed to Scheel,[20] Gutekunst and Ziegenfus. The court is satisfied that this unique compilation of standard and nonstandard formulas was and is an SI trade secret treated as such by SI.

■ Notwithstanding the presence of a trade secret, defendants argue there is no evidence to support any inference they either took or are using the content of the formula book. Such argument overlooks the actions of Ziegenfus who shortly after leaving SI reduced to paper all the formulas he felt necessary to design a car-on-track system. It is apparent that his ability to do so was based in part on his experience with CARTRAC, experience certainly gained only by prolonged access to plaintiff's trade secret. Therefore, although the book itself was not physically taken from SI, the court is convinced that its contents were taken in the minds of Ziegenfus, Scheel and Gutekunst such that reproduction thereof by Ziegenfus was possible. Accordingly, the trade secret of plaintiff was taken and we accordingly conclude is being used by him for the defendants to design and construct ROBOTRAC.

Defendants urge as a defense to plaintiff's claims that CARTRAC can be reverse engineered and, hence, given *Van Products* there are no trade secrets warranting protection. Defendants called as their only witness in the hearing Dr. Terrence Willis, a consulting engineer from Chicago, Illinois. Dr. Willis possesses a Ph.D. in Engineering, has done some teaching and pri-

vate work in the field and has engaged in extensive court-related engineering consultations. His testimony was directed to the field of reverse engineering which he defined in the following manner:

> Reverse engineering is the task of examining a piece of equipment to some level and taking that information back to your own laboratory or work shop or engineering department, using that information to engineer the piece of equipment to do the same job and substantially in the same configuration.

He described his experience in the field of reverse engineering in these terms: "I have done reverse engineering to pieces of equipment in terms of engineering them for laboratory purposes ..." Given the voluminous testimony as to the uniqueness and complexity of a CARTRAC system it is clear that Dr. Willis did not possess the background necessary to reverse engineer a CARTRAC. His attempts to do so lend credence to this conclusion.

Dr. Willis testified he reverse engineered the defendants' prototype located in Eagle's factory in Niles, Illinois. In reviewing the system, Dr. Willis continually used such language as, "It is simply a little railroad car" (Volume XXI, page 105); and, "If you want to move articles around in a production line, I can put things on the top of this little truck." His conclusionary statements as to the system he observed are absolutely at odds with all other testimony in this matter. Dr. Willis concluded as follows:

> So what I think I've got here for you is I have a car. It is a simple railroad car mounted on wheels. It runs on a track. It is guided on a track by these little wheel guides. The wheels run on a steel track. There is a spinning tube longitudinally beneath the track. The brown wheels bear against the tube, and they are borne against it under pressure which is controlled by how much spring pressure you apply to them. That's adjustable. They can be rotated by one of three mechanisms here which will

---

**20.** Scheel acknowledged a fair amount of the material in the book was a refinement of gener-

al engineering principles as applied to CARTRAC.

achieve the same phenomenon, that is, bear the drive wheel against the spinning tube and cause propulsion of the car under controlled conditions, and the basic concept is then spinning tube, a wheel bearing against it, re-orient the wheel creates a propulsion force. That is the basic concept, and that is what I'm trying to illustrate here.

It strains the conscience of this court to conclude that such a simple mechanism could possibly engender the interest of, much less the dollars from, an industrial giant such as General Motors. How could General Motors ever spend over $17,000,000 for such a "simple little railroad car"?

Nevertheless, based on this simplistic approach, Dr. Willis offered two opinions. First, he opined that his team of four engineers, three draftsmen and two technicians could, if given full access to the ROBOT-RAC prototype, reverse engineer it in three weeks. Secondly, he opined that without measuring or taking any part of the system apart but rather by simply visually inspecting the mechanism and knowing the function it is to perform it could be reverse engineered in eight to ten weeks.

Dr. Willis then testified he carefully reviewed a certain document prepared by the defendants sometime in September, 1983 which purportedly contained reverse engineering data of an SI CARTRAC system at a GM plant in Janesville, Wisconsin. Based on that document, pictures of the Janesville facility, and a trip to Wisconsin to view it he offered an opinion that the entire system could be reverse engineered in ten to twelve weeks. Lastly, he offered that without the benefit of any measurements, but by visually inspecting the system and knowing its function, four engineers without CARTRAC experience, could reverse engineer the entire system in 16 to 18 weeks.

This testimony is completely foreign to other testimony in the case. To begin with, we know the product is a highly sophisticated and engineered one. General Motors would not spend the millions of dollars it has paid for CARTRAC if such a system were so easily amenable to reverse engi-

neering. Dr. Willis stated he saw nothing in the CARTRAC system that looked like a secret patentable object. To the contrary, the system contains already patented items and at least three other mechanisms that are the subjects of pending patent applications. Dr. Willis testified that one could not tell tolerances of a particular part by simply measuring it, yet tolerances are absolutely crucial to the proper functioning of this system. The tolerances testified to by plaintiff's witnesses were not tolerances readily available from some standard text as alluded to by defendants' expert. Testimony that GM paid SI for 18,000 engineering hours to produce the automotive CART-RAC is completely at odds with Dr. Willis' ten to twelve weeks to reverse engineer CARTRAC. Further, Dr. Willis made an estimate of draftsmen's time in weeks needed to reverse engineer a system but was unable to say what one draftsman could accomplish in any given period of time.

On balance the court finds that Dr. Willis did not have the expertise as to the scope of the field of his alleged endeavor—reverse engineering of a sophisticated highly engineered materials handling system. His testimony, therefore, expressed no more than an unsupported conclusionary opinion which ignored rather than simply conflicted with the evidence of record. The inconsistencies, lack of foundation and illogical result cause the testimony of this witness to be of no moment. Further, there was no testimony that reverse engineering would yield the know-how which is part of the SI product. For these reasons defendants fail in proof of the defense of reverse engineering.

There is no question that the trade secrets discussed herein were imparted to the defendants while they were in the employ of SI. Further there can be no question they are now using these secrets. This so for several reasons. Secrets in manufacturing and installation, and defendants use thereof, have already been discussed. The use of the SI systems engineering know-how is evidenced by HEICO's ability to bid for General Motors contracts and in one instance secure a contract. Defendants'

own documents evidence three other instances of use. First, the use of SI's costing and pricing methods to devise system prices 20% lower than SI's demonstrate use of SI confidential information. Second, the unsolicited bid shows the misuse of trade secrets in the compromise of confidential customer information and the use of systems engineering know-how. Lastly, the HEICO letter to GM is blatently predicated on offering to GM the knowledge and experience of eight former SI employees to supply CARTRAC at discounted prices. Further evidence of use can be gleaned from HEICO's bid on the Buick City job. Such could only have been made with the knowledge of the three pending patent applications—information nowhere else disclosed to anyone.

■ Pennsylvania law provides:

The duty of the servant not to disclose secrets of the master may arise from an express contract, or it may be implied from their confidential relations. It is likewise true that other persons who induce such disclosures by an employee, knowing of his contract not to disclose, or knowing that the disclosure is in violation of the confidence reposed in him by his employer will be enjoined from making use of the information so obtained. Where confidence is reposed, and the employee by reason of the confidential relation has acquired knowledge of trade secrets, he will not be permitted to make disclosure of those secrets to others to the prejudice of his employer. *Macbeth-Evans Glass Co. v. Schnelbach,* 239 Pa. 76, 85–86, 86 A. 688, 691 (1913).

In the instant case four of the individual defendants served as executive officers of SI during their employ. The other four were managers and important employees of SI, and were the recipients of trust and confidence by that employer. Knowledge of SI's trade secrets was gained by all defendants while standing in a confidential relationship with SI.[21] Use thereof is, therefore, subject to injunctive relief.

Application of the various principles of law to the facts established at the hearing leads to the following conclusions.

SI possesses confidential, proprietary information relating to the design, manufacture, and installation of its CARTRAC product which constitute trade secrets and as such are protectible. SI has not disclosed these trade secrets outside of its company, they are of value to it and because of them it enjoys a competitive advantage over others who do not know them. During the course of their employment at SI the individual defendants learned these trade secrets and, at their present place of employment, are utilizing these secrets to design and market a substantially similar product to the SI CARTRAC.

■ It will be virtually impossible for the various individual defendants not to use their CARTRAC systems engineering knowledge if they continue to work in car-on-track materials handling systems. Further, continued use of it by them would inevitably result in disclosure to fellow employees and potential customers. For these reasons a limited injunction against disclosure and use of the information is not sufficient.

This court will enter an order which protects SI's trade secrets but at the same time will not preclude the individual defendants from pursuing a livelihood.

### ORDER

AND NOW, this 1st day of March, 1984, IT IS ORDERED that:

1. all defendants are enjoined from the use and disclosure of any mechanisms developed by them or any of them to design around the Jacoby patent;

2. all defendants are enjoined from the use and disclosure of any detailed drawings of car-on-track materials handling products not revealed by the CARTRAC hardware;

3. the defendants Dentner, Bitely and Possinger are enjoined from engaging in

---

**21.** The court notes the existence of nondisclosure language in the aforereferenced Employee Agreements executed by all individual defend-ants. In light of the finding of a breach of a confidential relationship the court will not discuss the efficacy of these agreements.

any costing/pricing of a car-on-track materials handling system;

4. the defendants Scheel, Gutekunst and Ziegenfus are enjoined from concepting, designing, manufacturing, marketing or installing of any car-on-track materials handling system except as may be necessary to complete the General Motors Livonia Plant installation;

5. this injunction being preliminary in nature is limited in time until final hearing and the issuance thereafter of an order pertaining to plaintiff's application for a final and permanent injunction; subject, however, to earlier termination, upon appropriate application, if the confidential information in question comes into the possession of defendant by legitimate means.

IT IS FURTHER ORDERED that the plaintiff shall, within fifteen (15) days from the date hereof, unless said period of time is further extended by the Court, post appropriate bond in the amount of $100,-000.00 with the Clerk of the Court, for the payment of such costs and damages as may be incurred or suffered by any party or parties found to have been wrongfully enjoined or restrained.