THE HYMAN COMPANIES,
INC., Plaintiff,

v.

Michael E. BROZOST, et al., Defendants.

Civil Action No. 97–269.

United States District Court,
E.D. Pennsylvania.

March 12, 1997.

Sandor Engel, Allentown, PA, Steven A. Bergstein, Hyman, Engel, Wiener and Berg-

stein, Allentown, PA, for the Hyman Companies, Inc.

Joseph Wolfson, Stevens & Lee, Reading, PA, for Michael E. Brozost, Erwin Pearl, Inc., Erwin Pearl, Inc. Premium Sale, Erwin Pearl Retail, Kuzmann Chain Co., F.O. Inc.

## MEMORANDUM

GAWTHROP, District Judge.

This is a difficult case. It goes to the very heart of a lawyer's ethics: the continuing and sacrosanct duty of fidelity to a client, versus the right to be emancipated from that client and to go off to do lawyering elsewhere. The subtle tugs and tensions between that duty and that right raise questions that are particularly knotty.

Before the court is Plaintiff's Motion for a Preliminary Injunction. Plaintiff, The Hyman Companies, Inc., filed this diversity action to prevent its former General Counsel and Vice President, Michael Brozost, from working for its competitor, Erwin Pearl, Inc. Plaintiff argues that such employment would lead to disclosure of trade secrets and material protected by the attorney-client privilege. Defendants counter that Plaintiff cannot establish that Brozost will breach his ethical or fiduciary obligations as an attorney, and that Brozost does not possess trade secrets. After a hearing, argument, and due deliberation, I shall partially grant the Motion.

## I. Background

Ten years ago, Nat L. Hyman formed The Hyman Companies, Inc. ("Hyman"), which is incorporated in Delaware and has its principal place of business in Allentown, Pennsylvania. Hyman operates a chain of 42 high-end costume jewelry retail stores, located at affluent sites throughout the United States and Canada. Hyman does not manufacture its own jewelry.

Erwin Pearl, Inc. ("Pearl"), a New York corporation, competes with Hyman in the retail sale of high-end costume jewelry. Pearl's President, Erwin Pearl, owns several affiliated companies which design, manufacture, and sell fine and high-end costume jewelry. In the past 'year and three-quarters,

they have begun to sell their jewelry through their own independent retail stores. Because landlords typically want only one high-end costume jewelry store per location, Hyman competes with Pearl for selling space as well as for customers.

Michael Brozost, Esquire, is an attorney with nearly thirty years of experience in real estate law. A member of the New York and D.C. bars, he was real estate counsel for Southern Railway and J.C. Penney before becoming in-house counsel for The Goodman Company, a real estate developer.

In October, 1993, Mr. Hyman hired Brozost as General Counsel for the Hyman Company. There never was a written employment contract, or a non-compete agreement. Indeed, a lawyer generally may not sign a restrictive covenant. See Pennsylvania Rule of Professional Conduct 5.6. Later promoted to Vice President, and working out of a Florida office, Brozost handled all legal matters relating to Hyman's operations, including employment, insurance, billing, collections, and copyright issues. He was involved in site inspection, lease negotiation and administration, and in coordinating efforts with real estate consultants. He also developed professional relationships with landlords, developers and hotel chains. Brozost first met Mr. Pearl while acting as Mr. Hyman's personal representative.

Mr. Hyman talked with Brozost on a daily basis, using him as a confidant and sounding board. Topics of discussion included: (1) the profitability of individual stores and which regions and stores were the most profitable, (2) general criteria for choosing store locations, and how these criteria applied to specific locations, (3) innovative retail locations, (4) potential expansion opportunities, including which other retailers might be willing to sell stores, (5) which stores Hyman would be willing to sell and at what price, (6) arguments for why developers should choose Hyman over its competitors as a tenant, (7) specific hiring criteria, and (8) plans for Hyman's future. One such discussion occurred on December 31, 1996, after Brozost had been offered a position with Pearl. Other discussions are memorialized in Memoranda from September, 1995 to November, 1996.

Mr. Hyman disclosed this information to Brozost believing it would be protected by the attorney-client privilege.

While Brozost was employed at Hyman, the only information to which he was not privy was the salary of other executives. Mr. Hyman instructed his employees to give Brozost whatever other information he requested. Brozost thus knows the identity of the suppliers of Hyman Inc.'s computer system and insurance. He became well familiar with Hyman's criteria for effective lighting and case design. He received profit-and-loss statements for stores when needed to negotiate either for rent relief or for lease renewals.

As a major part of his job, Brozost learned where lease negotiations were pending and the salient details of those leases. Negotiations were still pending at several of these locations at the time of the hearing. He knows the other Hyman stores whose leases will soon be up for renewal. Because he was involved in negotiations to terminate leases, Brozost also knows which locations Hyman wishes to abandon. Although Brozost stated under oath that he only remembers the exact lease termination date for one store and cannot recall any other specific details about Hyman leases, I do not believe his pate to have suddenly become so empty. The record is replete with testimony as to his steel-trap memory for minutiae, and, although at Hyman he did have a lease-summary book to fall back on, I do not find that his memory bank self-destructed when he switched jobs.

It is true that some of the information possessed by Brozost is available through other sources. For example, property managers of shopping malls will often provide figures for gross sales per square foot; although these figures tend to be somewhat inflated, there is much that one can glean from these numbers. Real estate consultants may be able to provide more accurate sales figures. Hyman's gross sales are not secret. Landlords rarely have an obligation to keep lease terms confidential and will often, for practical, business reasons, let out the word as to whether a lease is soon to cease. Another public source is Mr. Hyman, himself, who gave an interview to *Women's Wear Daily* in which he disclosed four definite, and two possible, future store sites.

Mr. Pearl professes to have no interest in the comings and goings of Hyman, on the basis that his company is actually more involved in the manufacture of jewelry than its direct sale. It is true that Pearl operates somewhat differently. Mr. Pearl, who first got into this line of work as a diamond cutter, evolved into a highly successful designer and manufacturer of jewelry. This he still does, and it constitutes the bulk of his business. His foray into direct marketing began less than two years ago, and he claims that since he, unlike Hyman, makes his own product (Hyman makes none, buys all), and since he, unlike Hyman, produces only original creations (Hyman tends to make costume facsimiles), his business is different. I can see that it is different, but I find it to be not all that different. Both Pearl and Hyman sell high-end costume jewelry, with prices often running into four figures. Their products may have their dissimilarities, but apples and bananas they are not. I cannot help but think that Mr. Pearl's curiosity is more than a wee bit piqued as to which high-end costume jewelry marketing philosophies Mr. Hyman discovered to be effective through a hard decade of trial and error, and what precise store sites he has set his sights on. Mr. Pearl himself would keep confidential his own stores' profitability figures and specific sites to which he plans to expand.

At Mr. Hyman's request, two years ago Brozost contacted Mr. Pearl to discuss the bankruptcy of CIRO, another chain of costume jewelry stores. Brozost followed up repeatedly to determine Mr. Pearl's interest in either selling his stores, or in purchasing stores from Hyman. Impressed with Brozost's persistence, and presumably his general ability and his knowledge, both specific and general, Mr. Pearl expressed an interest in hiring him. On December 9, 1996, they met to discuss his possibly coming to work with Pearl. During that meeting, Brozost disclosed the name of the company which provided Hyman's computer system. This was no ordinary company, but one which Mr. Hyman had discovered only after lengthy trial, error, and research. Having a comput-

er company able to tailor a program to work well with the particular esoterica of one's particular business is important in this day and age, and often not easy to find. In late December, Mr. Pearl asked Brozost to become Pearl's in-house counsel, and Brozost accepted. Since coming aboard, Brozost's work has consisted principally of contacting real estate brokers concerning store sites, drafting leases, and handling insurance matters.

On January 6, 1997, Brozost told Mr. Hyman he was leaving for Pearl. After a one-week transition period, Mr. Hyman's attorney instructed Brozost to get out of Hyman's Florida office forthwith. When he left, Brozost took his private papers, blank lease forms which he had drafted, and lease addendum books that he had written while working for a previous employer. The complaint in this action was filed that same day.

There is conflicting expert testimony about whether Brozost's employment by Pearl would constitute a conflict of interest and a breach of his fiduciary obligations as an attorney. Samuel C. Stretton, Esq. testified for Plaintiff that it would. Abraham C. Reich, Esq. testified essentially that he would have "no problem" with what Brozost was doing.

## II. *Discussion*

Plaintiff argues that Brozost has inside information which, if revealed, would be devastating to Hyman's business. It asserts that Brozost's knowledge of Hyman's trade secrets, together with his fiduciary obligations as an attorney, warrant injunctive relief. The defense counters that Brozost's knowledge is more in the nature of general knowledge of the industry, and that to preclude his job change would stultify the right of a lawyer to move from one employer to another in our free society's flexible economy.

In deciding whether to grant a preliminary injunction, a court weighs the following factors: (1) has the movant shown a reasonable probability of eventual success on the merits? (2) will the movant be irreparably injured by denial of injunctive relief? (3) will the grant of preliminary relief result in even greater harm to the non-movant? and (4) will granting preliminary relief be in the public interest? *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1254 (3d Cir.1985). Pennsylvania law governs.[1]

### A. Fiduciary Obligations as Attorney

Before a movant can show a reasonable probability of success on the merits, he must demonstrate that the activity sought to be restrained is actionable. Activity is actionable if it constitutes a breach of a duty imposed by statute or by common law—such as attorneys' failure to perform their fiduciary duties properly. Failure so to do is actionable, and threatened failure so to do is enjoinable. *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 602 A.2d 1277, 1283 (1992).

The facts of *Maritrans* are enlightening. There, the court upheld an injunction barring the law firm Pepper, Hamilton & Scheetz from serving as labor counsel for competitors of its former client, Maritrans. For ten years Pepper had represented Maritrans in a broad range of corporate and labor relations matters, during which Pepper had gained detailed financial information and had come "to know the complete inner-workings of the company along with Maritrans' long-term objectives, and competitive strategies in a number of areas including the area of labor costs, a particularly sensitive area in terms of effective competition." *Maritrans,* 602 A.2d at 1280. Maritrans's competitors admitted the value of that knowledge: "labor costs are the one item that make or break a company's competitive posture" in that industry. *Id.* at 1281. The trial court found a substantial relationship between the labor negotiations of Maritrans and of its competitors, even though those negotiations involved different unions. *Id.* at 1280, 1282.

1. Plaintiff contends, Defendants do not dispute, and I agree that Pennsylvania law governs this action. Plaintiff's corporate headquarters and principal place of business are in Pennsylvania, Brozost was paid by Hyman in Pennsylvania, Brozost served Hyman in Pennsylvania, and the harm is being done principally in Pennsylvania.

Similarly, at bar, Brozost had acquired detailed inside knowledge of Hyman's operations: its lease terms, individual store profitability, and sites of planned future expansion, among other items—information as critical to Hyman's competitiveness as labor costs were to Maritrans. This information goes to the essence of how Hyman markets its jewelry, Hyman's *raison d'etre*. This tends to show that the activity sought to be restrained is actionable.

*Maritrans* is not the sole guide for determining whether Hyman has a reasonable probability of success on the merits. Beyond *Maritrans*, the two expert attorney ethicists opined upon the Pennsylvania Rules of Professional Conduct's codification of the common-law fiduciary duties of attorneys. Specifically, Rule 1.9(a) provides: "A lawyer who has formerly represented a client in a matter shall not thereafter: (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client...." That provision's terms seem fairly clear, and this clarity is at first reinforced by the Rule's comment: "When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited." But the comment's next sentence tends to muddy the waters a bit: "On the other hand, a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client." The comment reads on: "The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question."

■ The question, it seems to me, turns on the quality of the information received by Brozost whilst representing Hyman. If Brozost could reveal only general costume jewelry-vending information, he may sally forth to work for Hyman's competitor, Pearl, with impunity. But if Brozost could divulge specific, valuable, confidential information

learned while at Hyman, information that, if disclosed, could injure Hyman's economic health to the point of irreparable harm, a fiduciary duty has been breached and the conduct may be enjoined.

■ Looking at the full panoply of data Brozost gained at Hyman, most seem to fall within the general-knowledge category. Some of that knowledge has value. For example, the subtle criteria for selecting effective personnel to run the stores, and the marketing tricks in site selection and store layouts, are most valuable and learned only after a lot of hard work. But were that sort of general knowledge of the industry sufficient to preclude a job change within that industry, the resulting inflexibility in attorney employment would be too great and contrary to the public interest. I believe it would take the attorney's fiduciary duties too far.

On the other hand, the specific knowledge Brozost acquired as to certain leases falls, in my view, within the common-law prohibition exemplified by Rule 1.9(a). Hyman lease negotiations in which Brozost participated are still pending at several locations. If Pearl pursues those same spaces, Brozost could not represent Pearl without breaching his fiduciary duty to Hyman. Similarly, if Pearl fights with Hyman for store space which Hyman occupied during Brozost's tenure, Brozost should be barred from acting as Pearl's attorney. If both firms fight over Hyman's store spaces, the terms of which leases, I find as a fact, Brozost well knows, then Brozost's involvement is an enjoinable conflict of interest. I recognize the argument that some lease information can be garnered from other sources. But I find those circuitous routes to learning real-estate facts to be unwieldy, unreliable, and by no means a certainty. The plenary, direct knowledge of Brozost makes these back-door attempts to gain information pale by comparison. In these situations, I find that Hyman has fulfilled the prerequisites for a preliminary injunction.

■ Except in the situations outlined above, however, Brozost may act as Pearl's attorney. Thus, Brozost may negotiate leas-

es for locations which Hyman did not bid for or occupy during his employment at Hyman. Although Brozost would assume a position adverse to Hyman for negotiations of the same type as he had done for Hyman, such negotiations would concern problems wholly distinct from those which Brozost in fact solved for Hyman. Because Brozost may negotiate leases for spaces in which Hyman has no interest, I shall not issue an across-the-board injunction prohibiting Brozost's employment by Pearl.

### B. Trade Secret

Under Pennsylvania law, the showing of the existence of a trade secret is a prerequisite to obtaining an injunction against use or disclosure of information. See *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1255 (3d Cir.1985). Pennsylvania courts have adopted the definition of "trade secret" in Restatement of Torts § 757 comment b (1939):

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

*SI Handling*, 753 F.2d at 1255. A trade secret does not include know-how: "the employee, upon terminating his employment relationship with his employer, is entitled to take with him 'the experience, knowledge, memory, and skill, which he gained while there employed.'" *Van Products Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d 769, 776 (1965) (as quoted in *SI Handling*, 753 F.2d at 1262). Nor may matters of public knowledge or of general knowledge in an industry be deemed a trade secret. *See Anaconda Co. v. Metric Tool & Die Co.*, 485 F.Supp. 410, 421 (E.D.Pa.1980) (quoting Restatement of Torts § 757, Comment b at 5–6 (1939)). To determine whether information is a trade secret, a court should consider: (1) the extent to which the information is known outside of the owner's business, (2) the extent to which it is known by those involved in the owner's business, (3) measures taken by the owner to guard the secrecy of the information, (4) the value of the information to the owner and his competitors, (5) the amount of effort and money expended by the owner to develop the information, and (6) the ease or difficulty with which the information could be acquired or duplicated by others. *SI Handling*, 753 F.2d at 1256.

There is caselaw standing for the proposition that trade secret protection should not be bestowed upon information in the hands of a third party by whom it is not treated as secret. *SI Handling*, 753 F.2d at 1259. But that rule must be tempered in the attorney-client context. Mr. Stretton trenchantly observed that although a lawyer may know through the representation of a client that the client has several felony convictions, all of which are nestled in the public records of the files of various clerks of courts, that lawyer is not free to divulge those convictions. *De jure* public records are often not that *de facto* public. Although they may be technically "open" to the public, they may be actually gathering dust and cobwebs in the back corner of some basement of some courthouse annex. Thus, even though third parties possess information regarding Hyman's leases, Brozost himself is not free to reveal this information. Nor may Brozost impart to others Hyman's business plans, including its proposed targets for expansion. Similarly, the identity of Hyman's vendors should be protected; but at this juncture, because Brozost already has divulged their names, injunctive relief would be in vain.

On the other hand, trade secret protection is not available for Hyman's methods of operations and negotiation. The testimony revealed that these methods are largely a matter of know-how. As discussed before, in the professional conduct context, an employee should be entitled to take general knowledge from one employer to another. The specific methods identified at the hearing—how to negotiate a lease, how to identify a good location, and how to evaluate a candidate for a job—all qualify as general knowledge rather than trade secrets.

Individual store profitability, in contrast, may be protectible as a trade secret. Store profitability encompasses a "range of data relating to materials, labor, overhead, and profit margin." *SI Handling,* 753 F.2d at 1260. When this range of information, as a whole, is not "readily obtainable by anyone in the industry," it may be entitled to trade secret protection, particularly where the competitor has demonstrated it will use the figures. *Id.* Here, Brozost received profit and loss statements for most, if not all, of Hyman's stores. Although the statements submitted into evidence were all over a year old, what's past is prologue, and I do not find Brozost's knowledge of store profitability to be worthlessly stale. Because Hyman has shown a reasonable probability of success on this particular issue, I find that Hyman is entitled to limited preliminary injunctive relief: Brozost may not disclose any information relating to the profitability of Hyman's stores.

### III. *Conclusion*

In sum, I find that much of the information possessed by Brozost does not qualify for trade secret protection, and that its disclosure would not flout Brozost's fiduciary obligations as an attorney. The record before me does not justify a preliminary injunction barring Pearl from employing Brozost in any capacity at all.

But as for the facts and numbers surrounding the specific leases upon which he worked for Hyman, I find them to be protected and their disclosure enjoinable. Brozost shall be precluded from representing Pearl in the jousting for rental of those particular stores. I also shall enjoin Brozost from disclosing Hyman's store profitability figures and Hyman's business plans. In these discrete areas, I find that Hyman has shown a reasonable probability of success on the merits, and that denial of injunctive relief would cause Hyman irreparable injury. Because the relief is limited, the harm to the defendants is not greater than the potential harm to Hyman. Nor is this limited relief contrary to the public interest.

An order follows.

### ORDER

AND NOW, this 12th day of March, 1997, upon the reasoning in the attached Memorandum, Plaintiff's Motion for a Preliminary Injunction is GRANTED IN PART on the following terms:

1. Michael Brozost is ENJOINED from representing Erwin Pearl, Inc., or any company affiliated with Erwin Pearl, Inc., in any lease negotiation upon which he worked for The Hyman Companies, Inc.

2. Michael Brozost is ENJOINED from representing Erwin Pearl, Inc., or any company affiliated with Erwin Pearl, Inc., in any lease negotiation for a retail space which The Hyman Companies, Inc. occupied between October, 1993 and December, 1996, and at which The Hyman Companies, Inc. wishes to remain.

3. Michael E. Brozost is ENJOINED from disclosing any information, acquired during his employment by The Hyman Companies, Inc., regarding The Hyman Companies, Inc.'s retail leases.

4. Michael E. Brozost is ENJOINED from disclosing any information, acquired during his employment by The Hyman Companies, Inc., regarding The Hyman Companies, Inc.'s future plans, including proposed sites for expansion.

5. Michael E. Brozost is ENJOINED from disclosing any information, acquired during his employment by The Hyman Companies, Inc., regarding the profitability of The Hyman Companies, Inc.'s stores.

Plaintiff's remaining requests for preliminary injunctive relief are DENIED.

Pursuant to Fed.R.Civ.P. 65(c), Plaintiff shall file a bond in the amount of ten thousand dollars ($ 10,000.00).